IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,              )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )   No. 09-20125-M1V
                                       )
                                       )
MARIO HAYWOOD,                         )
                                       )
        Defendant.                     )

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION AND AMENDED
MOTION TO SUPPRESS

_____

The defendant, Mario Haywood, has been charged in an indictment with possessing more than 500 grams of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Before the court is the April 9, 2010 motion to suppress and the August 3, 2010 amended motion of Haywood to suppress all searches, statements, and evidence obtained by law enforcement officers on March 21, 2009, on the grounds that the searches were unconstitutional under the Fourth Amendment, and any evidence seized pursuant to the searches must be suppressed. Specifically, Haywood seeks to suppress cocaine and other incriminating evidence found during the search of his person and the search of his car located at 2664 Dwight, Memphis, Tennessee. Haywood also seeks to suppress a statement he made to police in which he admitted ownership of the incriminating evidence which he now seeks to

suppress.  Haywood's motion and amended motion were referred to the United States Magistrate Judge for a report and recommendation.

The court held an evidentiary hearing on September 23, 2010. At that hearing, the government called four witnesses, all from the Memphis Police Department ("MPD"): (1) Detective Mario McNeal; (2) Detective Lee Wiggins; (3) Detective Benjamin O'Brien; and (4) Detective Willard Tate.  Haywood testified on his own behalf and also called two witnesses: (1) Tiarha Moss, the defendant's cousin; and (2) Cora Moss Haywood, the defendant's mother.  The parties introduced a total of eight exhibits into evidence: (1) Search Warrant; (2) MPD Arrest Ticket on Haywood; (3) Affidavit of Complaint; (4) MPD Rights Waiver Form on Roshina Holloway; (5) Haywood's Statement; (6) Computer Copy of Holloway's Statement; (7) Detective Wiggins' Supplemental Arrest Report; and (8) United States Postal Service's Time Clock Record of Cora Moss Haywood's Activity on March 21, 2009 ("USPS log").  After careful consideration of the statements of counsel, the testimony of witnesses, the evidentiary exhibits, and the entire record in this case, the court submits the following findings of fact and conclusions of law and recommends that the amended motion to suppress be denied.

I.  PROPOSED FINDINGS OF FACT

On March 21, 2009, between approximately 4:00 and 4:30 p.m., the MPD's Organized Crime Unit dispatched a team of detectives to

survey a residence located at 2664 Dwight, Memphis, Tennessee. While the officers went to the scene, Detective McNeal stayed back in order to procure a search warrant for the residence located at 2664 Dwight and a maroon 2001 Pontiac Bonneville with the tag number 895-FSX.  The residence, owned by Haywood's grandfather, is a white house with black trim and sits on the northwest corner of a cove located on the cross streets of Derby and Dwight.  Dwight runs east to west, and Derby runs south and north into the cove where 2664 Dwight is located.  The Bonneville, owned by Haywood, was parked on the street on the northwest curb of the cove facing south down Derby.

Detective Tate testified that he was assigned as an undercover agent and was the first to arrive on the scene to conduct surveillance.  Detective Tate parked his tinted, black Buick Sedan on Lucy, a street located about 50 yards from 2664 Dwight.  His car faced the residence and the Bonneville so that he could have a clear view of the inside of the Bonneville through the front windshield using binoculars.[1]  Detective Tate testified that he observed Haywood and four males walk from the front porch of the house down to sit in the Bonneville.  He further testified that he saw the men conduct "hand-to-hand transactions" of what looked

---

[1]     Detective Tate testified that the Buick Sedan and the Bonneville were both tinted.  However, he stated that the windshields of both cars are not tinted, and he could clearly see inside the Bonneville with binoculars.  Haywood confirmed that the windshield of the Bonneville is not tinted.

like, to him, a trade of drugs for money. Detective Tate stated that he did not actually see distinct dollar bills or drugs traded, but that the gestures and conduct of the men appeared as if they were exchanging items while sitting in the parked Bonneville. According to Detective Tate, he sat in his car for about an hour and witnessed Haywood participate in "hand-to-hand transactions" in the Bonneville with different men on at least three separate occasions.

Detective Tate stated that shortly after the transactions occurred, a Chevrolet Malibu pulled up to the residence, and Haywood walked down to the car with a gun in his hand. He observed Haywood walk around the Malibu, hand the gun to the driver, Roshina Holloway, and walk back around the Malibu and get in the passenger side. As soon as Detective Tate saw this, he radioed his team to report what he had witnessed and advised them that Haywood was about to leave the residence. He testified that Haywood and Holloway drove southbound on Derby towards him. Detective Tate stated that he put on his vest marked "Police," stepped out of his unmarked car, and attempted to stop the Malibu. The Malibu slowed down, and, about that time, Detective Doty and Detective O'Brien approached from behind the Malibu in a marked police car. Haywood immediately exited the Malibu and attempted to flee on foot. Detectives Doty, O'Brien, and Tate chased Haywood and eventually caught and subdued him. Haywood was patted down and found with

4

three baggies containing white powder in one of his pockets and
$4,659.00 in cash and a bag of what appeared to be marijuana in
another pocket.  The detectives handcuffed Haywood, walked him back
to 2664 Dwight, and put out a broadcast on Holloway after realizing
that she had fled the scene.  According to Detective O'Brien, the
time stated on the arrest ticket, 5:45 p.m., evidences the time
when the stop began, that is, when Officer Tate first attempted to
stop Haywood. (Ex. 2.)

Detective McNeal testified that during the arrest and
subsequent search of Haywood, he was at 201 Poplar obtaining the
search warrant on 2664 Dwight and the Bonneville.  The warrant was
issued at 6:30 p.m. by Judicial Commissioner S. Miller Johnson.  As
soon as the search warrant was signed by Commissioner Johnson,
Detective McNeal informed his team over the radio that he was on
his way to the scene with the warrant in hand.  According to
Detective McNeal's testimony, the detectives did not search the
residence or the Bonneville until the search warrant was signed and
he arrived on the scene with it. Detectives Wiggins, O'Brien, and
Tate's testimony corroborated Detective McNeal's testimony on these
matters.  All the detectives testified that the residence and the
Bonneville were not searched before the search warrant was signed.
Detective O'Brien testified that they put Haywood in the back seat
of a squad car and waited for Detective McNeal to arrive with the
search warrant before searching the residence and the Bonneville.

Detective O'Brien further stated that Holloway was found, detained, and placed in the back of another squad car at the scene. While at 2664 Dwight, Detectives Owens and Doty interviewed Holloway about the gun and had her sign a Rights Waiver Form. (Ex. 4.) According to the Rights Waiver Form, the interview began and 6:08 p.m. and ended at 6:16 p.m.

Detective O'Brien testified that after McNeal arrived, the officers searched 2664 Dwight and the Bonneville while Haywood was detained in the back of his squad car. The search of the Bonneville produced $10,896.50 in cash and a plastic bag containing approximately 805 grams of cocaine which were located under the back seat.[2] Detective Wiggins testified that the detectives had to remove the back seat in its entirety to find these items. Nothing was found in the search of the residence.

Following the searches, Haywood and Holloway were transported to the Organized Crime Unit's office where Detective Wiggins took statements from both of them.  Detective Wiggins testified, as did Detective McNeal, that after the officers advised Haywood of his rights, Haywood gave a statement in which he admitted that the "dope" and money found in his pocket were his; that he owned the Bonneville; and that the cocaine and money found in the Bonneville were his.  However, when Haywood's statement was subsequently

_____

[2]  The arrest ticket also indicates two digital scales were found in the Bonneville.

reduced to writing, he refused to sign it.  (Ex. 5.)  The time reflected on his statement is 9:52 p.m.  (*Id.*)  The time reflected on Holloway's statement is 8:47 p.m.

Haywood's version of the events differs from the government's version in several respects.  Haywood testified that on March 21, 2009, he arrived at his grandfather's house around 4:30 p.m., but that he never left the porch to sit in his Bonneville.  Haywood denied conducting "hand-to-hand transactions" with other men. Haywood testified that he did get in the Malibu with Holloway, but insisted that he did not have a gun on him.  According to Haywood, Holloway was driving him to get beer when a black car, without any markings on it, "swooped" in front of them and blocked Holloway's Malibu.  Haywood admitted that he jumped out of the car and ran. Haywood testified that upon his apprehension, the detectives physically assaulted him, detained him, and took him back to the porch of 2664 Dwight.  Haywood further testified that the detectives immediately searched him and took him inside the residence.  Haywood swore that shortly after he was searched, the detectives detained him in a squad car while they searched his Bonneville.  He also swore that the detectives searched the Bonneville for a second time after tow trucks arrived to tow the Bonneville away.

The first witness that testified for Haywood was his cousin, Tiarha Moss.  Ms. Moss testified that she viewed the scene from

inside her aunt's house located at 2200 Derby Cove and never came out of the house that day. Ms. Moss stated that she saw men, who she thought must be the police, go inside 2664 Dwight and look in the Bonneville. However, Ms. Moss testified that she never saw the officers take any items out of the Bonneville. Ms. Moss did not testify as to what time this took place.

Haywood's mother, Cora Moss Haywood, testified that she received a call at work from her nephew informing her that Haywood was being detained by the police at 2664 Dwight. According to Ms. Haywood, she was on her lunch break from her job with the United States Postal Service when she got the call. The USPS log indicates that Ms. Haywood clocked out for her break at 6:02 p.m.[3] (Ex. 8.) Ms. Haywood testified that she left work when she got the call, drove straight to her father's house located at 2664 Dwight, and called her supervisor on the way to say that she would not be back for the rest of her shift. The USPS log indicates that she was clocked out at 6:15 p.m. by her supervisor. (Ex. 8.)

Haywood's mother first testified that she was not sure when she arrived at 2664 Dwight. Later she testified it was sometime between 6:20 and 6:25 p.m. Finally, she stated that she suddenly remembered checking the clock on her cell phone and it was actually

---

[3] The official time listed on the USPS log sheet is 18.04. According to Ms. Haywood, the USPS uses a clicking method with two clicks roughly equaling one minute, and 18.04 is approximately 6:02 p.m.

6:22 p.m. when she arrived at the residence.[4]  According to her testimony, there were cops inside the residence when she arrived and it looked to her as if the Bonneville had already been searched when she arrived.  She testified that there were items on top of the Bonneville when she arrived but that she didn't know what they were.  Later in her testimony, she claimed to have suddenly remembered exactly what they were.

Ms. Haywood also spent a considerable amount of time testifying about a piece of paper.  At first Ms. Haywood stated that while she was at the scene she remembered seeing a white man hand a black police officer a piece of paper, which she said "caused [the officers] to move."  Ms. Haywood testified that she did not know what the piece of paper was.  Later in her testimony, Ms. Haywood swore she suddenly remembered the piece of paper was a search warrant and testified that the man who had the piece of paper stated to the police officer, "This is the search warrant, now we can move."

The court finds the testimony of Detectives McNeal, Wiggins, O'Brien, and Tate to be fully credible. On all relevant matters, the detectives corroborated each others' testimony and such testimony was believable.  Haywood argues that the officers lack credibility because certain statements in the Record of Arrest (Ex.

---

[4]   The time when Ms. Haywood arrived at 2664 Dwight is critical to the defendant's position that the Bonneville was searched before the search warrant was signed at 6:30 p.m.

2), the Affidavit of Complaint (Ex. 3), and Det. Wiggins' Case Note Supplement (Ex. 7) are contrary to the testimony of the officers in court. In particular, Haywood points to the following statements in these documents: "When detectives executed the search warrant co-defendant Holloway drove off . . . ." (Exs. 2 & 7) and "As Detectives attempted to execute the warrant the defendant ran from the location on foot . . . ." (Ex. 3.) First, the court notes that the language in Exhibits 2 and 7 are identical in the entirety and were obviously "cut and pasted." In addition, both of these exhibits further state that after Haywood was detained, the detectives made entry into the residence and began searching the Bonneville. The court finds this sequence of events to be consistent with the officers' testimony at the hearing. In addition, all the detectives testified that this wording was incorrect, and the court finds the officers' testimony in this respect to be credible. The court accepts as fact the officers' version of the events that transpired.

The court finds the testimony of Tiara Moss to be credible in part. Although Ms. Moss offered consistent information, the information she gave was limited, her view of the scene was limited, she offered no time frame, and she became defensive when questioned about her ability to view the scene.

The court further finds the defendant and Ms. Haywood's testimony not to be credible. Ms. Haywood paused at length and

inappropriately supposedly to remember details, seemingly looked to Haywood and his counsel for guidance when asked a question by the government, claimed sudden recollection of facts, and gave contradictory answers to several questions.  Haywood's testimony was entirely self-serving and inconsistent with all other evidence.

## II.   PROPOSED CONCLUSIONS OF LAW

Haywood contends that the searches, statements, and evidence obtained by law enforcement on March 21, 2009 should be suppressed because (1) the searches took place before the search warrant was signed and issued; and (2) no exceptions to the warrant requirement are present in this case.  The government contends that the search of Haywood's person was valid as a search incident to arrest, and the search of the house was valid because it was authorized by a valid search warrant.  The government also contends that the search of the Bonneville was valid for two reasons: (1) the search took place after the search warrant was executed and (2) the search is valid under the automobile exception to the warrant requirement. Finally, the government contends that Haywood's statement should not be suppressed because it was given after Haywood was lawfully arrested and advised of his rights by *Miranda v. Arizona*, 384 U.S. 436 (1966).

## A.   The Search of Haywood

Haywood contends that the search of his person and the evidence found on him should be suppressed because the police

officers had no warrant to search, the search was not supported by probable cause, and no exceptions to the warrant requirement apply. The government admits that the search of Haywood took place before the search warrant was issued, but contends that the officers had probable cause to arrest and search Haywood.  The court finds that the search of Haywood was an investigative stop and frisk as laid out in *Terry v. Ohio*, 392 U.S. 1 (1968), and, therefore, analyzes the search under the *Terry* doctrine.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. CONST. amend. IV. Generally, under the Fourth Amendment, a police seizure of a person must be supported by probable cause.  *United States v. Fountain*, 2 F.3d 656, 661 (6th Cir. 1993).  However, an officer may conduct an investigative "stop and frisk" detention if he has reasonable suspicions that "criminal activity may be afoot," even if the officer lacks probable cause.  *Terry v. Ohio*, 392 U.S. 1, 22-24 (1968).  In cases involving a *Terry* investigative stop, the inquiry is two part: whether the initial stop and the subsequent frisk were reasonable under the Fourth Amendment.

1.  *Reasonableness of Initial Stop*

In order for an initial stop to be reasonable under the Fourth Amendment, the "officer must have a particularized and objective basis for suspecting the particular person stopped of criminal

activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).
The requirement for particularized suspicion has two elements: (1)
the assessment of whether the officer had a particularized
suspicion must be based on the totality of the circumstances and
(2) the assessment must yield a reasonable suspicion that the
particular person being stopped has committed or is about to commit
a crime. *Id.* at 418.

In the present case, Detective Tate's initial stop of Haywood
was reasonable under the totality of the circumstances. First, he
knew that a confidential informant had recently seen Haywood
selling and storing drugs at the residence near where the
Bonneville was parked. Second, Detective Tate observed Haywood
conducting what he thought were drug transactions in the
Bonneville, which was parked in an area known for high drug
activity. Third, Detective Tate testified that he saw Haywood
carrying a weapon that was not concealed. Fourth, when Detective
Tate attempted to get Holloway to pull her Malibu over, Haywood
jumped out of the car and ran. As such, Detective Tate testified
that he had a particularized suspicion that a drug exchange was
afoot. A reasonable officer with Detective Tate's background and
experience would likely would have made the same assessment and
would have tried to stop Haywood to confirm or dispel that
suspicion. Accordingly, it is submitted that the stop was lawful
under *Terry*.

2.  *Reasonableness of Frisk*

Once an officer has the requisite reasonable suspicion to conduct a *Terry* stop, he may conduct a pat-down to determine whether the person is carrying a weapon, if the officer has a justifiable belief that the individual whose suspicious behavior he is investigating is armed and presently dangerous.  *Terry*, 392 U.S. at 24-26.

In the present case, Detective Tate testified that he saw Haywood walk down from the porch at 2664 Dwight with a gun. Detective Tate said that he observed Haywood hand the gun to Holloway and get in the car with her.  Detective Tate also testified that he radioed the information that Haywood was carrying a gun to the rest of his team.  Accepting Detective Tate's testimony as fact, it is understandable that Detectives Tate, Doty, and O'Brien each had a justifiable belief that Haywood could be armed with the gun when he ran from them.  Given the fact that Haywood fled from two officers in uniform and one undercover agent wearing a clearly marked police vest and the high-crime nature of the area, Detective Doty was justified in frisking Haywood, out of concern for the safety of himself and others.  As such, it is submitted that the frisk was lawful under *Terry*.

Because the detectives' investigative stop and frisk of Haywood was reasonable under the *Terry* doctrine, it is recommended

that Haywood's motion and amended motion to suppress the fruits of the search of his person be denied.

B.   The Search of the Residence at 2664 Dwight

In determining whether a defendant has standing to contest the validity of a search, the proper inquiry is whether the defendant personally has an expectation of privacy in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978).  Haywood has the burden to show that he has standing.  *United States v. Sangiento-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).  Haywood admits that he did not live at 2664 Dwight and concedes that he does not have standing to object to the search of the house.  As such, the court finds that Haywood does not have standing to contest the search of the residence located at 2664 Dwight.  In addition, no evidence was seized from the residence.

It is recommended that the motion and amended motion to suppress the search of the residence and evidence found therein be denied.

C.   The Search of the Bonneville

Haywood argues that the search of the Bonneville and the evidence obtained therein should be suppressed because the search warrant was signed and issued after the search was made and no exceptions to the warrant requirement were present.  In response, the government argues that the search was not conducted until after the search warrant was executed and, even if the search warrant was

not executed prior to the search, the search was valid under the automobile exception to the warrant requirement.

1. *The Automobile Exception*

Warrantless searches and seizures are considered "per se unreasonable - subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).  One of these exceptions is the automobile exception, which allows police to search an automobile if they have probable cause to believe that it contains evidence of criminal activity. *United States v. Ross*, 456 U.S. 798, 807-08 (1982)(quoting *Carroll v. United States*, 267 U.S. 132, 160-62 (1925)).  Justification for the automobile exception derives from both the inherent mobility of vehicles and the reduced expectation in privacy of automobiles. *Cal. v. Carney*, 471 U.S. 386, 390-91 (1985).  The fact that an automobile is parked does not change the analysis of the automobile exception.  *See United States v. Markham*, 844 F.2d 366, 369 (6th Cir. 1988)(finding a warrantless search of a mobile home valid, even though it was parked in a private driveway).  In fact, warrantless searches of automobiles supported by probable cause are generally valid, even if the car's mobility is temporarily restricted or potential drivers have been secured.  *See United States v. Howard*, 489 F.3d 484, 493-94 (2d Cir. 2007)(finding the warrantless search valid under the automobile exception, even though the defendants were away from their vehicles at the time of

the searches); *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997)(finding exigency existed to search the defendant's car because there was a chance that someone might remove incriminating evidence from the vehicle while the defendant was in custody).

Probable cause to search has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The court determines whether there was probable cause according to the totality of the circumstances. *Id.* Personal observations of police officers and informant testimony regarding illegal activity may be used to establish probable cause. *See Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). The Supreme Court has developed a two-prong test to determine whether there was probable cause to search. *Ornelas v. United States*, 517 U.S. 690, 696-97 (1996). First, the court must determine the "historical facts" which include the events that took place up to the search. *Id.* Second, the court must determine whether the facts, "viewed from the standpoint of an objectively reasonable officer, amount to probable cause." *Id.*

In the present case, the government submits that the detectives had probable cause to arrest Haywood and search his Bonneville without a warrant based on (1) the information received from a confidential informant; (2) the detectives' personal observations; (3) the detectives' professional experience; (4) the

detectives' inference of illegal conduct, and (5) the drugs found on Haywood's person.   Detective McNeal testified that he had received information through a confidential informant regarding illegal drug activity taking place at 2664 Dwight and the model and license plate number of the Bonneville.   Detective Tate personally observed Haywood conduct hand-to-hand transactions and saw Haywood carry a gun that was not concealed.   Both Detectives O'Brien and Tate stated that Haywood ran as soon as they attempted to make an investigative stop.   Each officer testified that, from their experience, they knew the area to be a high drug activity area. The detectives had just located a substantial amount of drugs and cash on Haywood's person which corroborated Detective Tate's observation of what he believed to be hand-to-hand drug transactions in the Bonneville.   Under the totality of the circumstances, sufficient probable cause existed to cause a reasonable, objective officer to believe Haywood had committed a drug crime and that the Bonneville contained evidence of the criminal activity.   As such, the search of the Bonneville was proper under the automobile exception to the warrant requirement.

    2.   *The Search Warrant*

    The government argues that, even if the automobile exception does not apply, the officers had a valid search warrant that authorized the search of Haywood's Bonneville.   In opposition, Haywood argues that the search warrant was not signed or executed

until after the search of his Bonneville took place.  In addition, Haywood argues that there was insufficient probable cause to support the issuance of the warrant to search his Bonneville because there was no independent basis of probable cause as to the Bonneville set forth in the affidavit submitted in support of the application for the search warrant.

Having found the search valid under the automobile exception, the court need not consider whether there was sufficient probable cause to issue a search warrant authorizing the search of the Bonneville or whether the warrant was signed before or after the search took place.

The court recommends the motion and amended motion to suppress the fruits of the Bonneville search be denied.

D.  <u>Haywood's Statement</u>

Haywood argues that his statement should be suppressed as the fruit of an illegal search and seizure. He has not alleged a failure on the part of the officers to give a *Miranda* warning or any coercion on the part of the officers.  In response, the government argues that Haywood's statement should not be suppressed because it was voluntarily given after he was lawfully arrested and advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966).  Thus, whether or not Haywood's statement should be suppressed turns on whether his arrest was valid under the Fourth Amendment.

19

Before police officers conduct a custodial interrogation with a suspect, the suspect must be advised of his Fifth Amendment right to remain silent, that anything he says may be used against him, and that he has a right to have an attorney, either retained or appointed, present during interrogations. *Miranda*, 384 U.S. at 444. If officers ask questions of a suspect before giving *Miranda* warnings, the general rule is that the answers received will be presumed compelled and will be excluded from trial. *Oregon v. Elstad*, 470 U.S. 298, 316-17 (1985). A voluntary confession obtained after proper *Miranda* warnings may nevertheless be suppressed if it is the "fruit" of an illegal arrest. *Brown v. Illinois*, 422 U.S. 590 (1975).

In order to make a lawful arrest without a warrant, police officers must have probable cause to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The Supreme Court has recognized that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt, and therefore the arrest is constitutionally reasonable. *See, e.g.*, *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001).

For the same reasons articulated to support the finding of probable cause to search Haywood's Bonneville without a warrant, the court finds that the officers had probable cause to arrest

Haywood without a warrant.  In addition, there is no evidence that Haywood's statement was given involuntarily or coerced.  Because Haywood gave his statement voluntarily after being lawfully arrested and advised of his *Miranda* rights, his statement should not be suppressed as a fruit of an illegal arrest.

It is recommended that the motion and amended motion to suppress Haywood's statement be denied.

### III.  RECOMMENDATION

For the reasons expressed above, it is recommended that the Haywood's motion and amended motion to suppress be denied in its entirety.

Respectfully submitted this 8th day of October, 2010.


s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE