# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

UNITED STATES OF AMERICA,      )
                                     )
     Plaintiff,          )
                                     )
v.                            )     No. 09-cr-20125-JPM
                                     )
MARIO HAYWOOD,            )
                                     )
     Defendant.          )

---

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS

---

Before the Court is Defendant Mario Haywood's Amended Motion to Suppress (Docket Entry ("D.E.") 33), filed August 3, 2010.[1] The Court referred the Motion to the Magistrate Judge for Report and Recommendation. (D.E. 23.) Evidentiary hearings were held before the Magistrate Judge on September 23, 2010 and September 30, 2010. (See D.E. 42, D.E. 44.) The Report and Recommendation ("Rep. and Rec.") was received on October 8, 2010. (D.E. 45.) The Magistrate Judge recommended that the Court deny Defendant's Motion to Suppress. (Id.) The Government responded on October 18, 2010, stating that it has no objections to the facts or law as recommended by the Magistrate Judge. (D.E. 46.) On November 18, 2010, Defendant filed his

---

[1] Defendant filed the original Motion to Suppress on April 9, 2010. (D.E. 22.)

Objections to the Magistrate Judge's Report and Recommendation. (D.E. 52.)  Upon de novo review, having considered the arguments of Defendant and the Government, the Court adopts the Magistrate Judge's Report and Recommendation in its entirety and DENIES Defendant's Motion to Suppress.

## I. Background

Defendant is charged in a one-count indictment with possessing a controlled substance with the intent to distribute more than five hundred (500) grams of cocaine, in violation of 21 U.S.C. § 841(a)(1).  (D.E. 3.)  Defendant seeks to suppress cocaine and other incriminating evidence found during the search of his person and the search of his car located at 2664 Dwight, Memphis, Tennessee.  (See D.E. 52.)

On March 21, 2009, between approximately 4:00 and 4:30 p.m., the Memphis Police Department's ("MPD") Organized Crime Unit dispatched a team of detectives to surveil a residence located at 2664 Dwight,[2] Memphis, Tennessee.  (September 23, 2010 Mot. to Suppress Hr'g Tr. ("Hr'g Tr.") 44-45, 120-21.)  While the officers went to the scene, Detective Mario McNeal procured a search warrant for the residence located at 2664 Dwight and a maroon 2001 Pontiac Bonneville ("Bonneville") with the tag number 895-FSX.  (Id. at 16, 41-45, 51, 68.)  The Bonneville, owned by Defendant, was parked on the street on the northwest

---

[2] The house was owned by Defendant's maternal grandfather.  (See id. at 236.)

2

curb of the cove located on the cross streets of Derby and Dwight. (Ex. 2, R. of Arrest.)

Detective McNeal stated that a "reliable confidential informant" provided information concerning illegal drug activity at 2664 Dwight, as well as the model and license plate number of the Bonneville. (Hr'g Tr. 17-19, 38-39.) He testified that the informant had been "used on several different occasions and is responsible for two felony drug arrests, five drug seizures, including crack cocaine, marijuana, and heroine." (Id. at 17.) In the affidavit submitted in connection with the search warrant, the confidential informant stated that he had observed a "male black, Mario Haywood, dark complexion, five-six to five-eight in height, 30 to 35 years of age, 160 to 170 [pounds], selling and storing . . . cocaine, crack cocaine, drugs proceeds, and paraphernalia inside 2664 Derby Cove within the last five days." (Id.)

Based on the information he received from the confidential informant, Detective McNeal described the Defendant to Detective Willard Tate and sent Tate to 2664 Dwight to verify that this information was correct. (Id. at 19.) Detectives Tate and McNeal also verified that the Bonneville belonged to Defendant, based on the tag number provided by the informant. (Id. at 42.)

Detective Tate was assigned as an undercover agent and was the first to arrive on the scene to conduct surveillance. (Id.

at 120-21.) He parked his tinted, black Buick Sedan on Lucy, a street located about fifty yards from 2664 Dwight. (Id. at 130-32.) His car faced the residence and the Bonneville so that he could have a clear view of the inside of the Bonneville through the front windshield of his car using binoculars. (Id. at 133-34.)

Detective Tate observed Defendant and four males walk from the front porch of the house to sit in the Bonneville. (Id. at 124.) He then saw the men conduct "hand-to-hand transactions" of what appeared to be the trade of drugs for money.[3] (Id. at 134-36.) Detective Tate sat in his car for about an hour and witnessed Defendant participate in "hand-to-hand transactions" in the Bonneville with different men on at least three separate occasions. (Id. at 152-56.)

Shortly after the transactions occurred, Detective Tate observed a Chevrolet Malibu pull up to the residence, and Defendant walked down to the car with a gun in his hand. (Id. at 158.) Detective Tate observed Defendant walk around the Malibu, hand the gun to the driver, Roshina Holloway, and walk back around the Malibu and get in the passenger side. (Id. at 159-60.) As soon as Detective Tate saw this, he radioed his team to report what he had witnessed and advised them that

---

[3] Detective Tate stated that he did not actually see distinct dollar bills or drugs traded, but that the gestures and conduct of the men appeared as if they were exchanging items while sitting in the parked Bonneville. (Id. at 134-35.)

Defendant was about to leave the residence. (Id. at 151, 160-62.)

Defendant and Holloway drove southbound on Derby toward Detective Tate. The Detective stated that he put on his vest marked "Police," stepped out of his unmarked car, and attempted to stop the Malibu. (Id. at 161-63.) The Malibu slowed down, and, about that time, Detective Doty and Detective Benjamin O'Brien approached the rear of the Malibu in a marked police car. (Id. at 162-63.) Defendant immediately exited the Malibu and attempted to flee on foot. Detectives Doty, O'Brien, and Tate chased Defendant and eventually subdued him. (Id. at 163.)

The detectives patted down Defendant and found three small plastic bags containing white powder in one of his pockets and $4,659.00 in cash and a bag of what appeared to be marijuana in another pocket. (Id. at 23, 30-31, 164-65.) The detectives handcuffed Defendant, walked him back to 2664 Dwight, and put out a broadcast on Holloway after realizing that she had fled the scene. (Id. at 163.) Detective O'Brien testified that the time stated on the arrest ticket, 5:45 p.m., evidences the time when the stop began, that is, when Detective Tate first attempted to stop Defendant. (Id. at 102-05, Ex. 2.)

During the arrest and subsequent search of Defendant, Detective McNeal was at 201 Poplar obtaining the search warrant on 2664 Dwight and the Bonneville. (Id. at 21-22.) The warrant

was issued at 6:30 p.m. by Judicial Commissioner S. Miller
Johnson. (Id. at 39, 78-80, 83.) As soon as the search warrant
was signed by Commissioner Johnson, Detective McNeal informed
his team over the radio that he was on his way to the scene with
the warrant in hand. (Id. at 39, 51, 105-106.)

The detectives did not search the residence or the
Bonneville until the search warrant was signed and Detective
McNeal arrived on the scene with it. (Id. at 24.) Detectives
Lee Wiggins's, O'Brien's, and Tate's testimony corroborated
Detective McNeal's testimony on these matters. (See id. at 68
(Wiggins Testimony); 118 (O'Brien Testimony); 165-66 (Tate
Testimony).) Detective O'Brien testified that they put
Defendant in the back seat of a squad car and waited for
Detective McNeal to arrive with the search warrant before
searching the residence and the Bonneville. (Id. at 105-06.)

Detective O'Brien further stated that Holloway was found,
detained, and placed in the back of another squad car at the
scene. (Id. at 103.) While at 2664 Dwight, Detectives Owens
and Doty interviewed Holloway about the gun and had her sign a
Rights Waiver Form. (Ex. 4.) According to this Form, the
interview began at 6:08 p.m. and ended at 6:16 p.m. (Id.)

After McNeal arrived, the officers searched 2664 Dwight and
the Bonneville while Defendant was detained in the back of the
Detective's squad car. The search of the Bonneville produced

$10,896.50 in cash and a plastic bag containing approximately 805 grams of cocaine, discovered under the back seat. (Hr'g Tr. 30-31.) The detectives removed the back seat in its entirety to find these items. (Id. at 72-73.) Nothing was found in the search of the residence. (Id. at 72-73, 118, 165, 263-65.)

Following the searches, Defendant and Holloway were transported to the Organized Crime Unit's office, located at 225 Channel Three Drive, where Detective Wiggins took statements from both of them. (Id. at 33-34, 67-71.) After the officers advised Defendant of his rights, Defendant gave a statement in which he admitted that the "dope" and money found in his pocket were his; that he owned the Bonneville; and that the cocaine and money found in the Bonneville belonged to him. (Id. at 72-73.) However, when Defendant's statement was subsequently reduced to writing, he refused to sign it. (Id. at 8, Ex. 5.) The time reflected on his statement is 9:52 p.m.[4] (Id. at 70.)

Defendant's version of the events differs from the Government's version in several respects. Defendant testified that on March 21, 2009, at around 4:30 p.m., he arrived at his grandfather's house but never left the porch to sit in his Bonneville. (Id. at 237.) Defendant denied conducting "hand-to-hand transactions" with other men. (Id. at 238.) He admitted that he did get in the Malibu with Holloway, but

---

[4] The time reflected on Holloway's statement is 8:47 p.m. (Id. at 74.)

insisted that he did not have a gun. (Id. at 238-39.)
According to Defendant, Holloway was driving him to get beer
when a black car, without any markings on it, "swooped" in front
of them and blocked Holloway's Malibu. (Id. at 239.) Defendant
admitted that he jumped out of the car and ran. (Id. at 240.)
Defendant testified that the detectives physically assaulted
him, detained him, and took him back to the porch of 2664
Dwight. (Id. at 240-43.) Defendant further testified that the
detectives immediately searched him and took him inside the
residence. (Id. at 242.) Defendant swore that shortly after he
was searched, the detectives detained him in a squad car while
they searched his Bonneville. (Id. at 243-44.) He also swore
that the detectives searched the Bonneville for a second time
after tow trucks arrived to tow it away. (Id. at 245.)

The first witness that testified for Defendant was his
cousin, Tiarha Moss. (Id. at 168.) She testified that she
viewed the scene from inside her aunt's house located at 2200
Derby Cove. (Id.) Ms. Moss stated that she saw men, who she
thought must be the police, go inside 2664 Dwight and look in
the Bonneville. (Id. at 170-72.) However, Ms. Moss testified
that she never saw the officers take any items out of the
Bonneville. (Id. at 172-74, 183-84, 187-88.) Ms. Moss did not
testify as to the time when these events took place.

Defendant's mother, Cora Moss Haywood ("Ms. Haywood"),
testified that she received a call at work from her nephew
informing her that Defendant was being detained by the police at
2664 Dwight. (Id. at 193-94.) According to Ms. Haywood, she
was on her lunch break from her job with the United States
Postal Service ("USPS") when she got the call. (Id.) The USPS
log indicates that Ms. Haywood left work at 6:02 p.m. (Id. at
200 (citing Ex. 8).) Ms. Haywood testified that she left work
when she got the call, drove straight to her father's house
located at 2664 Dwight, and called her supervisor on the way to
say that she would not be back for the remainder of her shift.
(Id. at 211.) The USPS log indicates that she was clocked out
at 6:15 p.m. by her supervisor. (Id. (citing Ex. 8).)
Defendant's mother first testified that she was not sure when
she arrived at 2664 Dwight. Later she testified it was sometime
between 6:20 and 6:25 p.m. (Id. at 211-212.) She stated that
she suddenly remembered checking the clock on her cell phone,
which read 6:22 p.m. when she arrived at the residence. (Id. at
213-14.)

According to Ms. Haywood's testimony, there were police
officers inside the residence when she arrived, and it appeared
to her as though the Bonneville had already been searched. (Id.
at 215-16.) She testified that there were items on top of the
Bonneville when she arrived but that she did not know what they

were.  (Id.)  Later in her testimony, she claimed to have
suddenly remembered exactly what they were.  (Id. at 230-32.)
Ms. Haywood also spent a considerable amount of time testifying
about a piece of paper.  (See id. at 217-33.)  At first Ms.
Haywood stated that while she was at the scene she remembered
seeing a white man hand a black police officer a piece of paper,
which she said "caused [the officers] to move."  (Id. at 218,
225, 232.)  Ms. Haywood testified that she did not know the
contents of the piece of paper.  (Id. at 231-32.)  Later in her
testimony, Ms. Haywood swore that she suddenly remembered the
piece of paper was a search warrant and testified that the man
who held the piece of paper stated to the police officer,
"[h]ere is the search warrant, now we can move."  (Id.)

    The Court agrees with the Magistrate Judge that the
testimony of Detectives McNeal, Wiggins, O'Brien, and Tate is
fully credible.  The detectives corroborated each others'
testimony, and their testimony was believable on all relevant
matters.  The Court further agrees with the Magistrate Judge
that the testimony of Defendant and Ms. Haywood is not credible.
The Magistrate Judge noted that "Ms. Haywood paused at length, .
. . looked to [Defendant] and his counsel for guidance when
asked a question by the government, claimed sudden recollection
of facts, and gave contradictory answers to several questions."
(Rep. and Rec. 10-11.)  The Magistrate Judge concluded that her

testimony "was entirely self-serving and inconsistent with all other evidence." (<u>Id.</u> at 11.)

## II. Standard of Review

"A district judge must determine <u>de novo</u> any part of a magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

The Court is not required to review those aspects of the Report and Recommendation to which no objection has been made. <u>Thomas v. Arn</u>, 474 U.S. 140, 150 (1985). The Court should adopt the findings and rulings of the Magistrate Judge to which a party files no specific objection. <u>Id.</u>; <u>United States v. Walters</u>, 638 F.2d 947, 950 (6th Cir. 1981).

## III. Analysis

In her Report and Recommendation, the Magistrate Judge recommended that Defendant's Motion to Suppress be denied. (Rep. and Rec. 21.) The Magistrate Judge made the following conclusions of law: (1) the search of Defendant's person was a valid search incident to arrest; (2) the search of the house was valid because Defendant lacks standing to contest the search, and no evidence was seized from the residence; (3) the search of the Bonneville was valid under the automobile exception to the

warrant requirement; and (4) Defendant's statement should not be suppressed because it was given after Defendant was lawfully arrested and advised of his <u>Miranda</u> rights.

### a. Defendant's Objections to Findings of Fact

Defendant offers numerous objections to the Magistrate Judge's proposed findings of fact. Defendant attacks the Magistrate Judge's conclusions with respect to the testimony of Detectives Tate, O'Brien, Wiggins, and McNeal, as well as Ms. Moss, Ms. Haywood, and Holloway. (Def.'s Objections to Report and Recommendation on Def.'s Mot. to Suppress ("Def.'s Objections") (D.E. 52) 3-7.) The Court addresses each of Defendant's factual objections in turn.

Defendant objects to the Magistrate Judge's finding that Detective Tate observed "hand-to-hand transactions" of what looked like a trade of drugs for money. He emphasizes that Detective Tate acknowledged that he did not see the actual items exchanged and that what he "described in his cross-examination at best describes a handshake." (Def.'s Objections 1.) Detective Tate testified that he saw "over-the-seat" transactions by Defendant and the other gentlemen in the Bonneville. He observed these transactions from one block away and with the use of binoculars. (Hr'g Tr. 124, 134-36.) Even though Detective Tate did not see distinct dollar bills or drugs being traded, (<u>id.</u> at 134-35), the officer reasonably concluded

based on his observations that a drug transaction was taking place. Accordingly, the Court OVERRULES Defendant's objection.

Defendant argues that the Magistrate Judge erred in crediting Detective Tate's testimony regarding how police pulled over Defendant (id. at 161-63), because it is inconsistent with Officer O'Brien's testimony that the officers performed a "regular traffic stop" when they pulled over Defendant. (Def.'s Objections 2 (citing id. at 100, 103-05).) This is a distinction without a substantive difference. Accordingly, the Court OVERRULES Defendant's objection.

Defendant objects to the Magistrate Judge's finding that Detectives O'Brien, Wiggins, McNeal, and Tate gave testimony that was consistent regarding the search of the residence. (Def.'s Objections 3.) Defendant urges the Court to consider that Detectives O'Brien and McNeal talked to one another regarding a "problem associated with the time of 5:45 on the arrest report" prior to giving their testimony concerning the time of the arrest. (Id.) This argument does not undermine the Magistrate Judge's finding that the time of 5:45 p.m. on the arrest ticket notes the time when the stop began. (Hr'g Tr. 102-05.) While Detective O'Brien stated he did not remember the time of the stop (id. at 114), Detective McNeal testified as to the accuracy of this time. (Id. at 27, 47.) Accordingly, the Court OVERRULES Defendant's objection.

Defendant contends that the Magistrate Judge erroneously omitted Detective Wiggins's testimony that the police "paperwork" concerning Defendant was completed at the police station after the "search" because of the amount of drugs recovered. (Def.'s Objections 3 (citing id. at 89).) Defendant also urges the Court to conclude that, because the interview with Holloway began at 6:08 p.m., the police search of the residence and Bonneville necessarily had to occur around 5:40 or 5:50 p.m., because it takes fifteen or twenty minutes to drive from the residence to the police station. (Def.'s Objections 3.) Defendant's objection is unfounded. The Court agrees with the Magistrate Judge, based on the record, that the interview of Holloway occurred at 2664 Dwight, not at the police station. (See Ex. 4, Rights Waiver Form). Detective McNeal testified that once he "executed the search warrant" and "searched the house," the police "left the scene with Defendant and Holloway back to [the police] office located at 225 Channel Three Drive." (Hr'g Tr. 33-34.) While Detective Wiggins's testimony suggests that some of the paperwork for Defendant and Holloway was completed at the police station, Wiggins did not testify that Holloway's rights waiver form was completed *at the police station*. (Id. at 89-90.)[5] Thus, the fact that Holloway's police interview occurred at 6:08 p.m. does not create any inference

---

[5] Defendant does not argue that Defendant's rights waiver form was completed at the station.

regarding when the searches occurred.  Accordingly, the Court
OVERRULES Defendant's objection.

Defendant objects that the Magistrate Judge failed to
credit Ms. Moss's testimony that she allegedly "saw police bring
[Defendant] back to the scene, descend on the house immediately
and that police were constantly in and out of the house."
(Def.'s Objections 3.)  As noted previously, the Court finds
that the testimony of Detectives Wiggins, O'Brien, Tate, and
McNeal is more credible than the testimony offered by Ms. Moss.
The Court agrees with the Magistrate Judge that on all relevant
matters, the detectives corroborated each others' testimony and
such testimony was believable.  (Rep. and Rec. 10.)  Ms. Moss's
testimony does not undermine this Court's conclusions that the
searches of the house, the Bonneville, and Defendant's person
were reasonable.  The Court OVERRULES Defendant's objection.

Defendant argues that the Magistrate Judge failed to note
that Ms. Haywood's employment records indicated that she left
work at 6:02 and called her supervisor.  (Def.'s Objections 3-
4.)  This is a distinction without a substantive difference.
The Magistrate Judge concluded that Ms. Haywood left work at
6:02, called her supervisor to indicate she would not be
returning for work, and was clocked out at 6:15.  (Rep. and Rec.
8.)  Defendant asks the Court to acknowledge that it takes ten
minutes to get from her work office to 2664 Dwight, and

therefore "the latest she could have arrived at her Father's house would be 6:25." (Def.'s Objections 3.) Moreover, Defendant emphasizes Ms. Haywood's testimony that when she arrived at the house, items were sitting on top of the car and that officers were coming out of the house. (id.) The Magistrate Judge noted these facts in her Report. (See Rep. and Rec. 8-9.) While the Court acknowledges these facts, they do not contradict the Magistrate Judge's findings that the searches were reasonable, as discussed in the next section. Accordingly, the Court OVERRULES Defendant's objection.

Defendant objects to the credibility of Detectives McNeal, Wiggins, O'Brien, and Tate, arguing that statements in the Record of Arrest (Ex. 2), the Affidavit of Complaint (Ex. 3), and Detective Wiggins' case supplement (Ex. 7) contradict their testimony. (Def.'s Objections 3-4.) Specifically, Defendant attacks Detective O'Brien's testimony that the Record of Arrest had poor word choice, where the Report stated that "[w]hen detectives *executed the search warrant*, co-defendant Holloway drove off southbound on Derby." (Id. at 4; Hr'g Tr. 112 (citing Exs. 2, 7) (emphasis added).) Defendant argues that the officers testified that Defendant fled while they executed the search warrant. (Def.'s Objections 4.) Defendant's objection is unfounded. As noted previously, Detective O'Brien testified that the officers placed Defendant in the back seat of a squad

car and waited for Detective McNeal to arrive with the search warrant before searching the residence and the Bonneville. (Id. at 105-06.) Thus, the Court OVERRULES Defendant's objection.

## b. Defendant's Objections to Conclusions of Law

Defendant raises three objections to the Magistrate Judge's proposed conclusions of law: (1) Detective Tate's Terry stop and frisk of Defendant were not reasonable (Def.'s Objections 5-6); (2) the officers lacked the probable cause necessary to conduct a search of the Bonneville under the automobile exception (Id. 6); and (3) Defendant's statement should be suppressed because it was the fruit of an illegal search. (Id.)

### i. Search of Defendant's Person

The Fourth Amendment applies to investigatory stops of cars. See, e.g., United States v. Hensley, 469 U.S. 221, 226 (1985). A police officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). The Court must look to the "totality of the circumstances" in order to ascertain whether a "particularized and objective basis for suspecting legal wrongdoing" exists. United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008) (internal quotations omitted). The suspicion must be "more than . . . a 'hunch' of criminal activity" but may be less than the

"level required for probable cause." Id. (citing, inter alia,

United States v. Arvizu, 534 U.S. 266, 274 (2002)).

As noted previously, the Court finds that Detective Tate's testimony is fully credible. The record shows that Detective Tate had an objectively reasonable suspicion to conduct an investigatory stop of Defendant. Detective Tate knew that a confidential informant had recently "observed illegal drugs inside [2664 Dwight] while drugs were being sold" within five days prior to the searches.[6] (Hr'g Tr. 17, 19, 38-39.) He observed Defendant conducting what he believed were drug transactions in the Bonneville, which was parked in an area known for high drug activity. (Id. at 98-99, 134-36.) He testified that he saw Defendant carry an unconcealed gun as he walked down to the Chevrolet Malibu, handed the gun to Holloway, and stepped into the passenger seat. (Id. at 158-60.) Defendant admitted that when Detective Tate attempted to pull the Malibu over, he jumped out of the car and ran. (Id. at 240.)

Detective Tate had a particularized suspicion that a drug exchange was happening. The Court agrees with the Report and Recommendation that "a reasonable officer with Detective Tate's background and experience would likely have made the same

---

[6] The Sixth Circuit has held that a five-day period in a search warrant affidavit is not too long to support the belief that drugs may be found at a particular premises. See United States v. Murphy, 241 F.3d 447 (6th Cir. 2001).

assessment and would have tried to stop Defendant to confirm or dispel that suspicion." (Rep. and Rec. 13.) Accordingly, the Court OVERRULES Defendant's objection that the Terry stop violated Defendant's Fourth Amendment rights.

Once an officer has the required reasonable suspicion to conduct a Terry stop, he may conduct a pat-down to determine whether the person is carrying a weapon, so long as the officer has a justifiable belief that the individual whose suspicious behavior he is investigating is armed and presently dangerous. Terry v. Ohio, 392 U.S. 1, 24-26 (1968).

Detective Tate saw Defendant walk down from the porch at 2664 Dwight with a gun. (Hr'g Tr. 158.) He observed Defendant hand the gun to Holloway in the Malibu and get in the car with her. Detective Tate then informed his team of what he saw. (Id. at 158-61.) Detectives Tate, Doty, and O'Brien had a justifiable belief that Defendant would be armed when he ran from them. Defendant fled from two uniformed officers and one undercover agent, who was wearing a clearly marked police vest. (Id. at 127, 161-62, 240.) Given these findings of fact and the high crime nature of the area, the Court agrees with the Magistrate Judge that "Detective Doty was justified in frisking Defendant, out of concern for the safety of himself and others." (Rep. and Rec. 14.) Thus, the Court OVERRULES Defendant's

objection that the Terry frisk violated Defendant's Fourth
Amendment rights.

### ii. Search of Automobile

Defendant objects that the officers lacked the probable
cause necessary to conduct a search of the Bonneville under the
automobile exception.[7] (Id. at 6.)  Warrantless searches and
seizures are considered "per se unreasonable, subject only to a
few specifically established and well-delineated exceptions."
Katz v. United States, 389 U.S. 347, 357 (1967).  The automobile
exception allows police to search an automobile if they have
probable cause to believe that it contains evidence of criminal
activity.  United States v. Ross, 456 U.S. 798, 807-08
(1982)(citations omitted).  Warrantless searches of automobiles
supported by probable cause are generally valid, even if the
car's mobility is temporarily restricted or potential drivers
have been secured.  See United States v. Howard, 489 F.3d 484,
493-94 (2d Cir. 2007)(finding the warrantless search valid under
the automobile exception, even though the defendants were away
from their vehicles at the time of the searches); United States
v. Brazel, 102 F.3d 1120, 1147 (11th Cir. 1997)(finding exigency

---

[7] Defendant argued in his Motion to Suppress that the search warrant was not
signed or executed until after the search of the Bonneville took place.
(Def.'s Am. Mot. to Suppress ("Mot. to Suppress")(D.E. 33) 3.)  The
Magistrate Judge did not reach this issue because she reasoned that the
search was valid under the automobile exception.  (Rep. and Rec. 19.)
Because the automobile exception validates the search in this case, the Court
similarly declines to consider the timing issue of the search warrant.
Defendant did not raise this argument in his objections to the Magistrate
Judge's Report and Recommendation.  (See generally Def.'s Objections.)

existed to search the defendant's car because there was a chance
that someone might remove incriminating evidence from the
vehicle while the defendant was in custody).

Probable cause to search has been defined as "a fair
probability that contraband or evidence of a crime will be found
in a particular place." Illinois v. Gates, 462 U.S. 213, 238
(1983). The court determines whether there was probable cause
according to the totality of the circumstances. Id. Personal
observations of police officers and informant testimony
regarding illegal activity may be used to establish probable
cause. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

The Supreme Court has developed a two-prong test to
determine whether there was probable cause to search an
automobile. Ornelas v. United States, 517 U.S. 690, 696-97
(1996). First, the court must determine the "historical facts,"
which include the events that took place up to the search. Id.
Second, the court must determine whether the facts, "viewed from
the standpoint of an objectively reasonable officer, amount to
probable cause." Id.

The Court agrees with the Magistrate Judge that the police
had probable cause to arrest Defendant and search the Bonneville
without a warrant. (Def.'s Objections 17-18.) Detective McNeal
testified that a confidential informant provided him with
information regarding illegal drug activity involving the

21

Defendant at 2664 Dwight within five days prior to the searches. (Id. at 17-19.)  The informant also shared with Detective McNeal the model and license plate number of the Bonneville.  (Hr'g Tr. 17-19, 38-39.)  As noted previously, Detective Tate personally observed Defendant conduct hand-to-hand transactions and saw Defendant carry a gun that was not concealed.  (Id. at 98-99, 134-36, 158-160.)  Both Detectives O'Brien and Tate stated that Defendant ran as soon as they attempted to make an investigative stop.  (Id. at 240.)  Each officer testified that, from their experience, they knew the area to be a high drug activity area. (See id. at 98.)  The detectives located a substantial amount of drugs and cash on Defendant's person.  (Id. at 23, 30-31, 164-65.)  These discovered items corroborated Detective Tate's observation of what he believed to be hand-to-hand drug transactions in the Bonneville.

Consistent with the Report and Recommendation, the Court finds sufficient probable cause for a reasonable, objective officer to believe Defendant had committed a drug crime and that the Bonneville contained evidence of the criminal activity, given the totality of the circumstances.  Accordingly, the Court OVERRULES Defendant's objection that the search of the Bonneville violated Defendant's Fourth Amendment rights.[8]

---

[8] Defendant does not object to the search of the residence at 2664 Dwight. (See Def.'s Objections.)  In determining whether a defendant has standing to contest the validity of a search, the proper inquiry is whether the defendant personally has an expectation of privacy in the place searched.  Rakas v.

### iii. Defendant's Statement

Defendant asks the Court to suppress his statement to Officer Johnson under the "fruit of the poisonous tree" doctrine. (Def.'s Objections 6.) The doctrine bars the admission of evidence obtained by "exploitation of [the] illegality" of a search or seizure. Pearce, 531 F.3d at 383 n.2 (citing Hudson v. Michigan, 547 U.S. 586, 592 (2006)). Defendant does not allege coercion by officers or a failure to provide Miranda warnings. (See Mot. to Suppress.) Nonetheless, a voluntary confession obtained after proper Miranda warnings may be suppressed if it constitutes the "fruit" of an illegal arrest. Brown v. Illinois, 422 U.S. 590, 597-605 (1975). Thus, as the Magistrate Judge noted, "whether or not [Defendant's] statement should be suppressed turns on whether his arrest was valid under the Fourth Amendment." (Rep. and Rec. 19.)

In order to make a lawful arrest absent a warrant, police officers must have probable cause to believe that a criminal offense has been or is being committed. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004). The Supreme Court has stated that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of

---

Illinois, 439 U.S. 128, 143-44 (1978). Defendant has the burden to show that he has standing. United States v. Sangiento-Miranda, 859 F.2d 1501, 1510 (6th Cir. 1988). The Magistrate Judge concluded that Defendant does not have standing to contest the search of the residence, because Defendant admitted that he did not live at 2664 Dwight. (Hr'g Tr. 15.) Also, no evidence was seized at the residence. (Id. at 72-73, 118, 165, 263-65.)

private and public interests is not in doubt and the arrest is constitutionally reasonable.  See, e.g., Atwater v. Lago Vista, 532 U.S. 318, 354 (2001).

For the same reasons that the Court finds probable cause to search the Bonneville without a warrant, the Court finds that the officers had probable cause to arrest Defendant without a warrant.  Accordingly, the Court finds that Defendant's statement should not be suppressed.

**IV. Conclusion**

For the foregoing reasons, upon de novo review, the Court adopts the Magistrate Judge's Report and Recommendation in its entirety and DENIES Defendant's Motion to Suppress.


**IT IS SO ORDERED,** this 20th day of December, 2010.


/s/ JON PHIPPS McCALLA
CHIEF UNITED STATES DISTRICT JUDGE